IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Industrial Service Solutions WC, Inc.;
RAM Industrial Services, LLC; and
AmeriMex Motor & Controls, LLC

        Plaintiffs,

   v.

Bluefin ESI, Inc., a Rhode Island
corporation,

Civil Action No. 4:26-cv-5541

## COMPLAINT

Plaintiffs Industrial Service Solutions WC, Inc. ("ISS"), RAM Industrial Services, LLC ("RAM"), and AmeriMex Motor & Controls, LLC ("AmeriMex," and collectively "Plaintiffs"), by and through their undersigned counsel, file this complaint asserting claims under the Declaratory Judgment Act and patent laws of the United States of America against Defendant Bluefin ESI, Inc. ("Bluefin" or "Defendant") and, in support thereof, allege as follows:

## INTRODUCTION

1. Plaintiffs are market leaders in industrial maintenance, operation, and repair services. Through years of research and development, engineering skill, financial investment, and business acumen, they developed a new, extremely

valuable technology—worth easily in excess of $100 million—to successfully reduce emissions from diesel-powered power generation systems sought by, among others, the data centers becoming increasingly important and prevalent in today's economy.

2.    Plaintiffs engaged Defendant Bluefin as an independent, non-exclusive, paid sales and marketing agent to introduce Plaintiffs to potential customers, pursuant to which Bluefin would be paid a commission on completed sales. Despite Bluefin's limited role, Bluefin used access and information received from Plaintiffs regarding the technology to file multiple patent applications in its own name.

3.    One such patent application, United States Patent Application No. 19/326,353 (the '353 Application) saw several of its claims enter allowance on May 14, 2026. On July 1, 2026, the United States Patent and Trademark Office filed an Issuance Notification stating that United States Patent No. 12,680,488 (the '488 Patent) would issue from the '353 Application on July 14, 2026, and the '488 Patent then duly issued on July 14, 2026. Bluefin has testified under oath that once the patent issues, Bluefin intends to sue Plaintiffs for patent infringement over Plaintiffs' Aftertreatment Genset (defined below).

4.    Defendant's '488 Patent claims, to the extent they can be at all discerned, do not cover Plaintiffs' Aftertreatment Genset.

5.    Plaintiffs thus deny infringement of the '488 Patent.

6.    In this action, Plaintiffs seek to, among other things, (i) obtain a declaration that Plaintiffs' Aftertreatment Genset does not infringe the '488 Patent; (ii) obtain a declaration that Plaintiffs have not infringed the '488 Patent by reason of implied license, (iii) obtain a declaration that no compensable provisional rights have accrued in the '488 Patent, (iv) obtain a declaration that the '488 Patent is unenforceable against Plaintiffs, and (v) correct inventorship of the '488 Patent pursuant to 35 U.S.C. § 256.

## THE PARTIES

7.    Plaintiff ISS is a Delaware corporation with a principal place of business at 840 Gessner Rd, Suite 950, Houston, TX. Plaintiffs RAM and AmeriMex are wholly owned subsidiaries of ISS.

8.    Plaintiff RAM is a Delaware limited liability company with a principal place of business at 2850 Appleton St., Ste. D, Camp Hill, Pennsylvania. RAM's sole member is a Delaware corporation with its principal place of business in Texas. Since 2013, RAM has been a wholly-owned subsidiary of ISS.

9.    Plaintiff AmeriMex is a Delaware limited liability company with a principal place of business at 610 N. Milby St., Houston, Texas. AmeriMex's sole member is a Delaware corporation with its principal place of business in Texas. Since 2013, AmeriMex has been a wholly-owned subsidiary of ISS.

3

10.    Bluefin is a Rhode Island corporation with its principal place of business at 640 George Washington Hwy, Building B, Suite 103, Lincoln, RI.

## JURISDICTION AND VENUE

11.    This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This Court also has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this matter arises under the patent laws, 35 U.S.C. § 1 et seq.

12.    Plaintiffs' and Defendant's dispute arises under the patent laws of the United States because it requires the adjudication of issues under federal patent laws that are actually disputed, substantial, and capable of resolution in federal court without disrupting the federal-state balance approved by Congress.

13.    This Court has personal jurisdiction over Bluefin in this District because through its contacts with this judicial district, it has availed itself of the rights and benefits of the laws of the State of Texas, it has conducted business in Texas relating to the development of the instrumentality it has accused of infringement, it has formed contracts with Plaintiffs designating Texas law and venue, and it has systematic and continuous business contacts with Texas.

14.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant is subject to personal jurisdiction in this judicial district, has directed its business and enforcement activities at this judicial district, and a substantial part of

4

the events giving rise to the claim occurred in this judicial district, and relevant witnesses and evidence are also located in this District. Further, venue is proper in this District as Plaintiffs ISS and AmeriMex reside in this District and the acts of Plaintiffs that Defendant has accused of infringement occurred in this District, pursuant to 28 U.S.C. § 1400(b).

## **FACTUAL BACKGROUND**

15.    ISS was founded in 2011 and is a market leader in national industrial maintenance, repair, and operations services. ISS manufactures, installs, integrates, and services critical process equipment across a range of industries, operating regional shops to provide nationwide field services supported by in-house engineering. ISS's regional shops are fully equipped to repair, overhaul, and inspect process and rotating equipment of all types, brands, and applications. ISS further engineers, designs, manufactures, and services high-performance power and control systems for high-demand applications.

16.    Due to its involvement across multiple industries and its range of capabilities, ISS is well positioned to successfully supply and service power generation solutions for unique client needs. In 2021, ISS identified that it could successfully enter the market for engineering and integration of large diesel generator systems needed to satisfy stringent emissions-control requirements. These

systems are required for a variety of applications, including without limitation power generation for data centers that continue to proliferate across the United States.

17.     Data center operators are exposed to substantial losses if a grid failure takes their centers offline. For this reason, many operators employ diesel generator systems as backup power sources if the electrical grid were to go down. This is not without complications, however, because diesel generators emit potentially hazardous pollutants such as nitrogen oxides ("NOx") that are subject to stringent government regulations. Thus, data centers that employ such diesel-powered backup systems need to ensure both that they can (i) satisfy the transient load performance requirements of the data center, defined by ISO-8528 standards, and also (ii) comply with stringent emissions standards.

18.     In or around November 2021, Paul Rembach, as an employee of Plaintiffs, conceived an ultra-low NOx ("ULN") diesel engine generator system featuring, among other things, a diesel fueled, medium speed engine with Exhaust Gas Recirculation ("EGR"), matched alternator, and another, additional form of specific exhaust aftertreatment which further reduces NOx, particulate matter ("PM"), and other emissions (collectively, the "Aftertreatment Genset"), allowing diesel generators to meet transient load requirements of high energy demand data center situations—including artificial intelligence, machine learning, demand

6

response programs, and long-duration operations—while also achieving emissions levels that satisfy stringent regulatory emissions requirements (the "Concept").

19.     ISS hired Mr. Rembach earlier in 2021 with the role and responsibility of identifying new markets for ISS.

20.     Thereafter, on behalf of Plaintiffs, Mr. Rembach began collecting baseline information regarding the rapidly growing market for power generation systems for data centers. This was a key strategic growth area for Plaintiffs. Mr. Rembach's research included identifying major data center contractors who would be potential customers. He also identified diesel power generators and other components that could be compatible with and used as part of the Aftertreatment Genset and, when used with it, could meet both a data center's reliability requirements and also emissions standards.

21.     Following this research, in late 2021, Mr. Rembach attended an industry conference and met with numerous data center operators. One of those operators expressed interest in purchasing natural gas power generator assembly, known in the industry as "gensets," for its data centers. Mr. Rembach approached Supplier 1, an engine manufacturer with whom he had a long relationship, and its sales representative told him they had a natural gas engine and quoted a price for it. Mr. Rembach in turn submitted a quote to the data center operator for a natural gas genset incorporating a Supplier 1 engine.

22.    Shortly after, however, Supplier 1 informed Mr. Rembach that it did not in fact have a natural gas engine that could be supplied. Mr. Rembach then was faced with finding a way to supply a genset to the data center operator that would achieve the emissions level of natural gas engines, which it had requested and for which Mr. Rembach had submitted a proposal.

23.    In response, Mr. Rembach conceived of the Aftertreatment Genset and the Concept, which would allow use of a diesel engine for power generation that nonetheless could achieve emissions levels at or below those of natural gas engines.

24.    On or around June 23, 2022, Mr. Rembach met with Supplier 1. Throughout their work on the Concept, Plaintiffs had identified certain engines of Supplier 1 as very suitable for its Aftertreatment Genset because those engines integrate EGR and, even on their own, are able to achieve NOx exhaust emissions at an extremely low level, known as Environmental Protection Agency ("EPA") Tier 4 Final.

25.    Through their extensive research and investment, Plaintiffs determined that they could design the Aftertreatment Genset using Supplier 1's diesel engine to further reduce NOx emissions *below* EPA Tier 4 Final standards and thereby achieve ULN emissions. In particular, the Aftertreatment Genset that Plaintiffs conceived and developed is capable of achieving sub-1 ppm NOx levels, which is significantly below EPA Tier 4 Final standards and comparable to or better than the NOx

emissions of many natural gas engines. Prior to Plaintiffs' Concept, diesel engines did not achieve the emissions reduction and PM and NOx levels comparable to natural gas generators. Plaintiffs' Concept solved this problem.

26.   During the June 2022 meeting with Supplier 1, Mr. Rembach described Plaintiffs' Concept of using Supplier 1's diesel engine as part of the novel Aftertreatment Genset that would eliminate additional pollutants. At the time of this meeting, and all other relevant times, ISS and Supplier 1 have had contracts in place protecting the parties' respective confidential and proprietary information.

27.   On May 13, 2024, over two years after Plaintiffs had devised the Aftertreatment Genset and Concept and almost two years after they had begun working with Supplier 1 in connection with the Aftertreatment Genset, a Bluefin representative contacted Plaintiffs about a business opportunity: an unidentified customer was looking for diesel engine and generator assemblies, known in the industry as "diesel gensets." The diesel gensets requested by this customer did not need ULN emissions and were unrelated to the Concept. Subsequently, Plaintiffs and Bluefin entered into contractual agreements under which Bluefin was contracted to serve as a manufacturer's representative and market and sell Plaintiffs' products.

28.   In its role as Plaintiffs' marketing agent, Bluefin was exposed to and learned from Plaintiffs important technical details about Plaintiffs' diesel genset products and components that comprise the Aftertreatment Genset.

29.    On June 21, 2024, a Bluefin representative emailed Plaintiffs regarding his visit to RAM's office and factory in Erie, Pennsylvania, confirming "the versatility of the [standard] ISS [diesel] genset design for prime power and simultaneous backup power."

30.    Between June and September 2024, Bluefin requested, and Plaintiffs provided, technical details regarding Plaintiffs' diesel genset products including test data, such as emissions data, sound data, power curves, and other technical specifications.

31.    In September 2024, Bluefin informed Plaintiffs that a second customer expressed interest in obtaining for its data centers diesel gensets from Plaintiffs that had even lower NOx emissions than existing diesel generators that satisfied EPA Tier 4 Final standards. Bluefin asked Plaintiffs and Supplier 1 for information and data as to whether that capability was feasible. This is the use-case for which Plaintiffs had developed the Concept years earlier, and Plaintiffs made clear to this customer that their Concept was the solution for this situation.

32.    Between September 2024 and November 2024, Plaintiffs sent Bluefin engineering drawings, specifications, computer-aided design ("CAD") files, factory acceptance testing data and other information needed to design, build, and engineer an Aftertreatment Genset.

33. On November 26, 2024, almost immediately after receiving this information, Bluefin filed a U.S. Provisional Patent Application (the "First Provisional") directed toward Plaintiffs' Concept and containing material that Bluefin knew Plaintiffs had invented.

34. Instead of listing Plaintiffs' employees as inventors, Bluefin falsely listed its own employees as the inventors on the First Provisional. Those Bluefin employees then assigned the application to Bluefin alone. Consequently, Bluefin is unlawfully listed as owner of the First Provisional, and its employees are unlawfully listed as the inventors of the First Provisional.

35. Bluefin continued to work with Plaintiffs for some time without disclosing its filing of the First Provisional to Plaintiffs. In December 2024 and January 2025, Bluefin obtained from Plaintiffs additional technical information regarding Plaintiffs' Aftertreatment Genset, including product specifications, drawings, and load calculations.

36. On January 16, 2025, unbeknownst to Plaintiffs, Bluefin filed another U.S. Provisional Patent Application (the "Second Provisional"), again based on and incorporating technical information that Plaintiffs provided.

37. The Second Provisional is directed toward Plaintiffs' Concept and contains material that Bluefin knew Plaintiffs invented.

11

38. In or around March 10, 2025, Plaintiffs received a small purchase order for a "proof of concept" or prototype of the Aftertreatment Genset.

39. In early June 2025, Plaintiffs performed extensive testing at Plaintiff AmeriMex's Houston facility for the prototype Aftertreatment Genset. Plaintiffs spent multiple millions of dollars testing the prototype. As marketing agent, Bluefin was paid and accepted a fee for this sale.

40. On September 11, 2025, Bluefin filed the '353 Application. The '353 Application is based on, and claims priority to, the First Provisional and the Second Provisional. Like the First Provisional and the Second Provisional, the '353 Application is directed towards Plaintiffs' Concept and contains material Bluefin knew Plaintiffs invented.

41. On June 12, 2026, Bluefin President Guillermo Weyer testified under oath that Bluefin would sue Plaintiffs for infringement over Plaintiffs' Aftertreatment Genset once a patent issued on the '353 Application.

42. On July 14, 2026, the United States Patent and Trademark Office issued the '488 Patent, containing the allowed claims of the '353 Application.

## COUNT I – Declaratory Judgment of Non-Infringement of the '488 Patent

43. Plaintiffs reallege and incorporate paragraphs 1–42 as if fully set forth herein.

44. The '488 Patent issued on July 14, 2026 at midnight EST.

45. Defendant Bluefin testified under oath that it would enforce the patent and sue Plaintiffs for infringement after it issued. As a result, an actual controversy has arisen and now exists between the parties as to whether Plaintiffs infringe the '488 Patent.

46. Plaintiffs do not infringe Claims 1–16 of the '488 Patent at least because, *inter alia*, Plaintiffs' Aftertreatment Gensets do not include an "engine including an onboard integrated in-cylinder exhaust gas recirculation (EGR) system achieving EPA Tier 4 Certification as an independent and first-stage emissions reduction mechanism" as required by Claim 1 of the '488 Patent and claims 2–16 that depend therefrom.

47. Plaintiffs do not infringe Claims 1–16 of the '488 Patent at least because, *inter alia*, Plaintiffs' Aftertreatment Gensets do not include a "control system being inducement-resilient whereby a malfunction or failure of the SCR system during non-emergency use does not trigger an engine shutdown, thereby maintaining mission critical availability of the engine" as required by Claim 1 of the '488 Patent and claims 2–16 that depend therefrom.

48. Plaintiffs do not infringe Claims 17–32 of the '488 Patent at least because, *inter alia*, Plaintiffs' Aftertreatment Gensets do not include an "engine including an onboard integrated in-cylinder exhaust gas recirculation (EGR) system

13

as an independent and first-stage emissions reduction mechanism" as required by Claim 17 of the '488 Patent and claims 18–32 that depend therefrom.

49.    Plaintiffs do not infringe Claims 17–32 of the '488 Patent at least because, *inter alia*, Plaintiffs' Aftertreatment Gensets do not include a "diesel engine … wherein the need for UPS intervention is reduced while improving data center reliability and throughput" as required by Claim 17 of the '488 Patent and claims 18–32 that depend therefrom.

50.    Plaintiffs are entitled to a declaration that they have not infringed and do not infringe any claim of the '488 Patent under any theory of infringement, including directly (whether individually or jointly) or indirectly (whether contributorily or by inducement).

## COUNT II – Declaratory Judgment that the '488 Patent is Not Infringed By Reason of Implied License

51.    Plaintiffs reallege and incorporate paragraphs 1–50 as if fully set forth herein.

52.    Plaintiffs and Bluefin had a contractual relationship by which Bluefin was to market Plaintiffs' Aftertreatment Gensets to potential customers.

53.    By asserting that Plaintiffs are liable for infringement of the '488 patent, Bluefin alleges that Plaintiffs' Aftertreatment Gensets infringe via use of technology claimed by such patent. While Plaintiffs expressly deny all allegations of infringement, to the extent any technology claimed by the '488 patent appears in

14

the Aftertreatment Genset, Bluefin granted Plaintiffs the right to use such technology.

54.    As a part of each sale of Aftertreatment Gensets to date, Bluefin was paid valuable consideration in the form of a commission.

55.    Bluefin is currently denying that Plaintiffs have an implied license to practice the '488 Patent because Bluefin testified under oath that it would enforce the '488 Patent against Plaintiffs.

56.    Bluefin's statements and conduct, both through the language of its contracts with Plaintiffs and otherwise, created the impression that Bluefin consented to Plaintiffs making, using, or selling the patented inventions, especially including sales to consumers other than Bluefin.

57.    Plaintiffs have not infringed the '488 Patent because to the extent any Aftertreatment Genset was manufactured, used, offered for sale, or sold within the United States before July 14, 2026, it was sold, used, or offered for sale by Bluefin, with its order fulfilled by Plaintiffs and commissions on such sale paid to Bluefin, or otherwise with Bluefin's involvement. Therefore, each such sale, use, or offer for sale is non-infringing under the equitable doctrine of implied license.

58.    Plaintiffs are entitled to a declaration that any manufacture, use, or sale of Plaintiffs' Aftertreatment Gensets by Plaintiffs does not infringe the '488 Patent by reason of implied license.

## COUNT III – Declaratory Judgment that No Compensable Provisional Rights Have Accrued in the '488 Patent

59.　Plaintiffs reallege and incorporate paragraphs 1–58 as if fully set forth herein.

60.　United States Patent Application Publication No. 2026/0146552 (the '552 Published Patent Application) was published on May 28, 2026. It matured into the '488 Patent on July 14, 2026.

61.　None of Plaintiffs' Aftertreatment Gensets made, used, offered for sale, or sold within the United States before May 28, 2026 infringe the '488 Patent for reason that to the extent any such manufacture, offers, sales or uses exist, they occurred before the USPTO published the '552 Published Patent Application. Therefore, Bluefin as patentee did not accrue any provisional rights pursuant to 35 U.S.C. § 154(d) as to any such manufactures, offers, sales, or uses.

62.　Plaintiffs are entitled to a declaration that to the extent any Aftertreatment Genset was made, used, offered for sale, or sold within the United States before May 28, 2026, Plaintiffs have not infringed, and Bluefin is not entitled to any provisional rights in such manufacture, use, offer, or sale.

## COUNT IV – Declaratory Judgment that the '488 Patent is Unenforceable Against Plaintiffs

63.　Plaintiffs reallege and incorporate paragraphs 1–62 as if fully set forth herein.

64.    The '488 Patent is unenforceable because Weyer and Lorenzo, or their authorized representatives hired to assist in the preparation, filing, and prosecution of the '488 Patent before the U.S. Patent and Trademark Office, all of whom had a duty of candor to disclose information material to the inventorship of the subject matter claimed in the '488 Patent, willfully and knowingly withheld and/or misrepresented information relating to the identity of Plaintiffs' employee(s) and their contributions to the claimed invention as true whole or joint inventors of the claimed subject matter.

65.    Weyer, Lorenzo, and Bluefin were aware of Plaintiffs' contributions to the technology claimed in the '488 Patent. On June 12, 2025, Mr. Weyer took the position that the technology that would later be the subject of the '488 Patent "is the result of a joint collaborative effort by [Supplier 1], Bluefin, ISS …" Indeed, Weyer, Lorenzo, and Bluefin were aware that Plaintiffs had conceived of and designed the "second-stage emissions treatment stage, downstream and in fluid communication with the diesel engine, including a low temperature selective catalytic reduction (SCR) unit" required of claims 1 and 17 of the '488 Patent.

66.    Also, Weyer, Lorenzo, and Bluefin were aware that Plaintiffs had conceived of or at least contributed to the conception of and designed the "EPA Tier 4 certified control system wherein the generator is operable in emergency and non-emergency applications" present in claims 1 and 23 of the '488 Patent. Further,

17

whereas Bluefin had believed urea was a suitable reductant for the invention, Weyer, Lorenzo, and Bluefin were aware that ISS had conceived of or at least contributed to the conception of using aqueous ammonia instead, as required by claims 2, 5, 15, 18, 21, and 31 of the '488 Patent.

67. Moreover, Weyer, Lorenzo, and Bluefin were aware that Plaintiffs had conceived of or at least contributed to the conception of configuring and arranging the engine to have "increased rotational inertia and torque output compared to similarly rated engines," as required by claims 7 and 17 of the '488 patent.

68. And Weyer, Lorenzo, and Bluefin were aware that Plaintiffs had conceived of or at least contributed to the conception of the technology's "inducement-resilient architecture with reliable operation in both emergency and non-emergency mission-critical applications" as required by claims 12 and 28 of the '488 Patent.

69. Weyer, Lorenzo, and Bluefin were aware at all relevant times that Plaintiffs or their employee(s) had conceived of or at least contributed the conceptions claimed in the '488 Patent, including without limitation each of the foregoing.

70. Weyer, Lorenzo, and/or their authorized representatives were aware at all times during the prosecution of the '488 Patent of their duty to cite material information to the USPTO. Despite this duty, Weyer, Lorenzo, and/or their

18

authorized representatives withheld the contributions of Plaintiffs' employee inventor(s), information which was material to securing a patent in their own names and assigned to Bluefin to the exclusion of correctly naming Plaintiffs' employee inventor(s) and assignment to Plaintiffs. Because Weyer, Lorenzo, Bluefin, and/or their authorized representatives were aware of the contributions of Plaintiffs and took the position that the technology was a "joint collaborative effort" with Plaintiffs, it is a reasonable inference that Weyer's, Lorenzo's, Bluefin's, and/or their representatives' failure to disclose Plaintiffs' employee inventors to the PTO was done with the specific intent to deceive the PTO.

71.    Based on the foregoing, Plaintiffs are entitled to a declaration that the '488 Patent is unenforceable against them.

## COUNT IV – Correction of Inventorship Pursuant to 35 U.S.C. § 256

72.    Plaintiffs reallege and incorporate paragraphs 1–71 as if fully set forth herein.

73.    Employee(s) of Plaintiffs are the true and correct inventor(s) of the '488 Patent.

74.    As discussed herein above, Defendant applied for and was issued the '488 Patent based on the representation that Weyer and Lorenzo were the sole inventors of the subject matter claimed therein.

19

75. This representation was false, because Defendant failed to disclose that representatives of Plaintiffs conceived of claims in the patents and were the true inventors.

76. At all relevant times, the Plaintiffs' inventing employees were without deceptive intent and were unaware of and played no role in any deception by Defendant.

77. Pursuant to 35 U.S.C. § 256, the '488 Patent should be corrected to reflect that Plaintiffs' inventing employees are the sole inventors or, at the very least, co-inventors. Pursuant to assignments from and agreements with these true inventors, Plaintiff ISS would be an owner/assignee of intellectual property developed by such inventors, including the '488 Patent.

78. By virtue of the foregoing, Plaintiff ISS is the legal and/or beneficial owner of at least an interest in the '488 Patent and has standing to seek a judgment to correct inventorship and declare that ISS is an owner of the Asserted Patents.

79. This controversy is ripe for determination at this time because the parties dispute ownership of technology and the related '488 Patent and because the '488 Patent has been issued by the PTO.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

20

A. A declaration as specified in paragraph 50 above that Plaintiffs do not infringe the '488 Patent;

B. A declaration as specified in paragraph 58 above that the '488 Patent is impliedly licensed to Plaintiffs;

C. A declaration as specified in paragraph 63 above that, to the extent any Aftertreatment Genset was made, used, offered for sale, or sold within the United States before May 28, 2026, Plaintiffs have not infringed, and Bluefin is not entitled to any provisional rights in such manufacture, use, offer, or sale;

D. A declaration as specified in paragraph 71 above that the '488 Patent is unenforceable against Plaintiffs;

E. Enter judgment correcting inventorship of the '488 Patent and/or award ISS an ownership interest in the '488 Patent; and

F. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

21

Dated:  July 13, 2026

Respectfully submitted,

/s/ Catherine Bratic

Catherine Bratic
Hogan Lovells Cadwalader US LLP
609 Main St.
Suite 4200
Houston, TX 77002
United States
Tel: 713-632-1400
Fax: 713-632-1401
catherine.bratic@hlc.com

Damon Lewis (*pro hac vice* forthcoming)
Hogan Lovells Cadwalader US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Tel: 202-637-5600
Fax: 202-637-5910
damon.lewis@hlc.com

*Counsel for Plaintiffs Industrial Service Solutions WC, Inc., RAM Industrial Services, LLC, and AmeriMex Motor & Controls, LLC*